Thank you. Good morning. Robert Henry on behalf of Appellants, Intervenor Defendants, the State of Arizona, and Governor Janice K. Brewer. I understand we have 20 minutes. I would like to reserve five minutes for rebuttal. Watch your clock. I will do so. This appeal, as you know, is about two Arizona statutes that address various problems and issues arising out of in-street employment solicitation. And I would like to make three very quick points. First, these statutes are triggered only when individuals engage in employment solicitation negotiations that actually cause a disruption in traffic. Anyone and everyone can continue to engage in these forms of solicitations everywhere, on sidewalks, in the streets, on side streets, etc. Okay, so it's commercial speech. We don't disagree about that? Or do we? Or do you, is it speech as opposed to conduct? Or what's your point on that? Well, the underlying activity being regulated, Your Honor, is the conduct. The issue, the speech, the underlying speech that gives rise to that conduct is indeed commercial speech. So why don't you just have a statute that just says you can't interfere with traffic? Well, we would submit that that was not the particular problem that the Arizona legislature and Arizona communities had been historically facing and causing the particular unique traffic safety issues here, which were arising out of specifically employment negotiations that have unique characteristics that are somewhat different than other potential instances where you might have someone stopping on the street. But don't you have general traffic laws that prohibit the blocking of roadways without regard to the content of whatever communication may be going on between the driver and somebody standing on the side of the road? Your Honor, there are indeed other statutes out there, civil and some criminal, that apply in various degrees to scenarios. But we submit that the record well demonstrates that those statutes and ordinances had obviously been insufficient to deter this very specific problem that the Arizona legislature was seeking to resolve. Well, the district court basically found that you've got a legitimate problem in the sense of blocking traffic, but that the manner in which the State has chosen to address that problem can be addressed by less intrusive means. And one of the less intrusive means is the existing traffic laws that are already on the book. Well, two responses to that, Your Honor. That would imply, if not expressly require, that the State, in this instance, apply a least restrictive means test or standard to addressing the problem. And with respect, I don't believe that's what First Amendment jurisprudence requires. I'm not sure if least restrictive means it's a lesser restriction as opposed to the least restrictive. And I think there's a distinction between the two. Well, but my second point, then, may address your concern or the issue here, and that is, well, the record demonstrates, we think quite clearly, that those existing traffic laws were not sufficiently deterring individuals from engaging in this type of conduct. Indeed, the plaintiffs' own declarations in this matter, we submit, demonstrate on their face that they had not been sufficiently deterred from engaging in these types of. But the problem I have with that argument is that the officer has to find out what the nature of the negotiation was in order to decide to take enforcement action. And that goes to the content of the communication between the driver and the person on the road standing next to the car. I don't – first, I don't think a well-trained officer would necessarily have to ascertain the nature or hear the actual communications to make that determination. Indeed, the Hill court in the Supreme Court in Hill found that there are instances where certain conduct can be objectively observed without hearing the actual communications to make a determination. Well, what do we do with the district court? Didn't the district court make a finding that the statute was intended to address illegal immigration? And don't we – would you agree that we have to accept that unless it's clearly erroneous? I would submit that the district court's finding in that regard was clearly erroneous, Your Honor. But that's the way we have to look at it, right? If you deem it to be a finding of fact as opposed to – Well, what was it then? Well, we submit that the district court in this regard – Just thinking about it or just talking out loud or ruminating? No, Your Honor. Judge Bolton in this instance looked solely to, we submit, one particular section of the bill from which these two statutes were – So did she make a finding then? Well, to the extent she did make a finding, Your Honor, we would submit – Well, that – did she make a finding? Yes, Your Honor. All right. And so then we review it for clearly erroneous, and your position is it's clearly erroneous? Yes, it is, Your Honor. Okay. I just want to understand that. But if, you know, if we – you know, obviously from the standpoint that Arizona is not in an unsympathetic position, and I think Justice Kennedy, you know, sort of made that point, but Arizona is not doing really well with the Supreme Court in addressing, you know, its efforts to address illegal immigration. And with that finding here, and I think what Judge Tallman is saying, don't you just have traffic laws that can handle this problem? Well, Your Honor, we submit that the case law is quite clear that you have to look to the whole context of a statute to determine what its purpose was. And here Judge Bolton looked solely to one particular provision of the bill. We submitted undisputed evidence of the legislative history going back to 2007, long before SB 1070 came about, demonstrating that the legislature and before that Arizona communities were trying to tackle the traffic safety issues and other concerns arising out of this particular conduct. And that evidence, unrefuted, was ignored, at least in the Court's order. Secondly, you have to look specifically, we submit first, to the text of the statutes. And we submit when you look at the text of these two statutes, not the bill, but the statutes at issue, they clearly on their face have nothing whatsoever to do with illegal immigration and indeed on their face address traffic safety issues by definition and operation. But what But you're saying day laborers, though, right? Aren't they addressing day laborers? Conduct of anybody soliciting work on or in the streets that causes a disruption in traffic. So it would include the high school cheerleaders who are conducting a car wash and trying to flag down passersby to get their car washed? Absolutely not, unless they're getting in the car. And even then it wouldn't be, because they wouldn't be being getting they weren't they wouldn't be getting in the car to go work at another site, which is what the statute expressly implies. But wouldn't the officer then, back to my earlier question, wouldn't the officer have to get into the nature of the communication in order to decide whether or not the law was being violated? Well, I think you then have a Hill situation where I think a well-trained officer is quite capable of determining whether this is a Girl Scout doing whatever and then for some understandable reason getting into the car. You have to get into the car before there's any violation? Yes, Your Honor. So if you're impeding traffic so long as the guy only comes up to your car and asks to be hired or is negotiating but then doesn't conclude and doesn't get into the car, then there's no violation? That's correct, Your Honor. And in fact, that hypothetical scenario, if it arises, these statutes are designed to provide incentive to the participants in that instance to do what the statutes are trying to incentivize here. And that is if you're going to have the initial conversation, take it to the side. I thought it was traffic. I thought it was impeding traffic. So you're saying that you can tie up traffic and negotiate because you talked about negotiations earlier. If the negotiations don't produce an actual hire, the impediment of traffic and the collection of people on the sidewalk, which is the other thing that was complained about and urinating on the walls, nothing happens. Is that it? And I don't think it's the actual hiring. It's the getting into the car component. When you're actually hired in the ‑‑ I would presume in most instances you're hired before you get into the car. But it's the getting into the car that disrupts traffic. So what is impeding traffic? What does the record show that they were trying to address? I envision this as people coming up to a stop sign or to a busy intersection, drivers, and there's a place where day laborers tend to congregate on the sidewalk or someplace off the street and where they are there legally and they are by just being there or by holding a sign, I need a job or whatever. And the car stops and instead of moving on, stays in position for a while, trying to decide whether they want to ‑‑ the driver wants to hire one or more people to do whatever odd job they have, like a roofing thing or gardening or whatever. And you're telling me and telling us that unless that transaction results in the person on the sidewalk coming into the car, there's no violation until that point. That is correct, Your Honor. In fact, that's why the statute is designed the way it is. You can even have the preliminary negotiations. But once it looks like you're going to want to hire and in the process disrupt traffic, take it to the side. Pull it to the side street or somewhere else. Okay. Well, then that sure puts a high premium on having a successful negotiation. People are tying up traffic, but unless they actually hire somebody and they get in the car. But you are saying they have to physically get in the car. Yes, Your Honor. Okay. And if it takes ten minutes to conclude the terms of the deal? Well, the statutes wouldn't apply. If other issues arise and there are other traffic issues that an officer can or other traffic ordinances or statutes that the officer can apply in that instance, he or she presumably would if it was causing that. Precisely. And that was Judge Tallman's question. Well. At the outset. If you're tying up traffic for a prolonged period of time, whether or not the person would allow them to ticket at least the driver, correct? So if that person just goes up and goes, you know, I mean, you just see the thumbs up, they jump in the car and then take off. So they haven't really tied up traffic, but the officer suspects that it was for employment because they saw the thumbs up, then that would be a violation of this statute, right? If you went and talked to them and said, yeah, it was, I said, got a job, that's a violation. There's no disruption of traffic in your hypothetical, Your Honor. Even though you just go out in the street and it's because in the middle of the street you're jaywalking and getting in a car, right? Sure. You'd be jaywalking perhaps, but you're not disrupting traffic. But you can disrupt traffic as long as they don't get in the car. Well, that's how the statutes are written, Your Honor. Okay. And that's the triggering event under these statutes. And we submitted it actually demonstrates that they are narrowly tailored. They don't cover all of these hypotheticals that are being submitted now and in the briefs. They only address in one narrow instance when you engage in these negotiations in the streets, they result in a disruption of traffic, and the individual gets into the car to go work at another location. That's what these statutes do. That's all they do. And we submit that this is not an unremarkable proposition. The Supreme Court, going back to the Cox Court quite some time ago, made it quite clear that, you know, under the First Amendment or otherwise, you know, the First Amendment doesn't authorize individuals to conduct street meetings in the middle of Times Square during rush hour as some form of speech or assembly. I mean, this underlying concept that you can't exercise your First Amendment rights in a manner that disrupts traffic is not a novel concept. Mr. Henry. Oh, go ahead. Well, help me with the language of the statute. I'm looking at Section 13-2928A, and it makes it unlawful for the occupant of a motor vehicle, the driver, that is stopped on a street to attempt to hire. I don't see anything in the statute that says the law can't be enforced until the door opens and the person that he's attempting to hire gets in the car. So how is an Arizona police officer supposed to know that the statute isn't violated until the door opens and the passenger gets in? Well, I suppose you would have to get into a statutory construction exercise, Your Honor. It doesn't then go on to say and pick up passengers. Isn't that why we're here? Well, exactly, Your Honor. We submit that the and pick up passengers. No, no. It criminalizes attempt to hire. And an attempt, as I understand criminal law, can be completed when the driver stops the car, rolls down the window and says, I'm looking for somebody to do some work in my garden. I'd like to hire you. Attempt to hire or hire and pick up, it goes on to say, Your Honor. And if that is the only particular portion of this statute that's problematic, there is a severability clause here. So we should strike down what? What should we sever? Well, if Your Honor is reading that. Should we sever the attempt to hire portion? To attempt to hire. If that's the concern that the Court here believes is implicating First Amendment rights or other concerns, I think you would then have to turn to the severability clause. But I think the purpose and intent of the statute is obvious, that it is designed to address scenarios where people are being hired, getting into vehicles, the negotiations take some time, they raise unique traffic safety issues, and they're causing problems in the streets. Well, I'm finding this is a little bit inconsistent to me in your argument, that in your opening brief you argued that day labor solicitation that impedes the flow of traffic is, quote, unquote, unlawful activity, and therefore is not entitled to protection under the first step of the central Hudson test. And that's in your blue brief at 28 to 29. Then when discussing the fourth step of central Hudson test, you argued that the district court clearly erred in finding that the existing laws already address this activity. So which is it? Then why did you need to pass Section 5? Because you're saying is day labor solicitation that obstructs the flow of traffic illegal under the existing laws, or is it not? So I'm not finding a consistency there. You're saying one thing at step one and another thing at step four. Yes and no, Your Honor. What step one step? Step one is most of the instances would implicate other traffic safety laws and ordinances. Step two is were they sufficiently doing so. And the legislature in its judgment determined that they were not. So they passed this, this, these statutes to design that, designed to address that specific issue and concern. And we submit that the district court respectfully erred when it concluded that those in the district court's judgment that those existing statutes were sufficient. I would like to reserve some time for rebuttal. You may. Unless you want to narrow the case even more. Good morning. My name is Victor Viramontes and I represent the friendly house plaintiffs and appellees. The basic question before the court is whether the state can punish individuals more severely because of the speech that they engage in. But not just any speech because Sections 5A and B are content discriminatory statutes. They single out only work solicitation speech for regulation and they do so on its face. Under the law of this circuit and of the Supreme Court, that makes them a content discriminatory law. In addition, because a law enforcement officer would have to listen to the speech of both the driver and the person soliciting work before figuring out if the law is being violated, that's another reason why this is a content-based law. Is that true? I mean, the closest analogy I can think of is soliciting prostitutes. And a car pulls up next to a scantily clad woman late at night in an area that the police know to be an area rife with prostitution and the officer sees a conversation between the driver and the prostitute. Maybe he knows that she's a prostitute and she gets into the car. As I understand, at least California solicitation statute, there may very well be a violation of the law at that point and the officer hasn't heard a word of the conversation. There's two responses, Your Honor. The first is that on its face the statute discriminates solely on work solicitation speech. The second is that an individual simply entering a car or simply engaging in some activity with another individual, it would be impossible to know what they were talking about. But if the officers in Arizona know that particular locations are utilized by day laborers and that the people who are standing around on the street corner waiting to hail people down are looking to be hired, why does the officer have to hear anything about the terms of the negotiation? Well, first of all, if they can't prove that it's work solicitation speech, then they don't have a violation under the statute. So the officer would have to either listen or watch. That's to prove it, but they'd have probable cause. But they wouldn't be able to prove that the actual speech, the content discriminatory nature of this statute, which requires that only work solicitation speech be criminalized. Well, you can prove it by not hearing. Just in the transaction, the prostitute transaction, you would not have heard the initial conversation, but all the circumstantial evidence would prove the prostitution was the purpose and result of the solicitation. So why wouldn't that also be true with respect to a day laborer? In both circumstances, you would have to figure out what it was that was said between the person soliciting. Well, you have to figure out. I'm asking you can do it, can you not do it from circumstantial evidence? Even if you're doing it from simply looking at what's occurred, the protected speech of waving your hand and letting somebody know that you're available to seek work, you would still need to look at the content of that speech. If you're waving your hand to, for example, do political speech in favor of a candidate or waving your hand to ask someone to pull over to pick you up for a ride, none of those would violate the statute. All of them would require you, the law enforcement officer, to inquire what was being said  Well, that's true. That's true. Let's assume that it is. So you're saying that it's you're arguing basically it's a content-based statute. That's all you're arguing. By this, they would have to prove that it was, in fact, employment solicitation. That's not the entirety of the argument. That's what I'm arguing at this moment, Your Honor. No, I understand. It's interchanges. Okay. Yes, and in addition Well, like in Redondo Beach, this Court found a more broadly applicable statute unconstitutional because it was over-inclusive. Now, you say this statute is unconstitutional because it's under-inclusive. If you're right, is there any way that the defendants can permissibly regulate motorists and pedestrians from blocking or impeding the normal movement of traffic? Yes. They could enforce the laws that outlaw the impeding of traffic. And that's precisely one of the reasons why, and if I may, I want to get into tailoring at this point, because these statutes do not directly advance the interests that they say they're doing. They attach criminal penalties for impeding of traffic, not based on how long you impede the traffic, not based on whether you recklessly impede traffic. They attach those criminal penalties based on the speech, the work solicitation. And because they are burdening speech rather than advancing the conduct that they say they're trying to regulate the impeding of traffic, they've got a tailoring problem there. Well, they say that the – I think their position is that the statute is directed at the secondary effects. That's my understanding of their argument here. If the secondary effects doctrine does apply outside of the adult entertainment context, does that mean that you lose here? No. For many of the same reasons that this Court struck the Redondo Beach ordinance. And this ordinance is different and has some different problems, some of the same problems with some of the different problems. But this statute cannot survive intermediate scrutiny either. The district court applied the commercial speech test, a form of intermediate scrutiny, a heightened form of intermediate scrutiny, which was the correct application after Sorrell. But no matter what standard you apply here, no matter what form of intermediate scrutiny or heightened scrutiny, they've got tailoring problems across the board. Counsel, let me ask you, would a general statute punishing any person from entering a car that is stopped and impedes traffic survive First Amendment scrutiny without regard? Well, it's hard to say based on having no record in front of me. There is a piece of – You're making a facial challenge to the statute. I'm asking if the Arizona legislature could enact a law that simply makes it a crime for a person to, I guess, hail a vehicle and enter it at the time that it impedes traffic. Well, let me say this. I think that statute would address some of the tailoring problems that we're seeing. Well, yeah, because if people were – I mean, I can arguably say if people are going out in traffic, getting in a car, you know, getting in a car, that there's some delay of getting in the car. And there's some risk for people walking out in the middle of the block. So that, you know, why would it – you know, that doesn't go to the speech at all. That just goes to anyone that – it means you can't pick people up. It means that the cheerleaders in their cute uniforms can't go out there and get in the car. It means taxi drivers can't pick up passengers. Yeah. There's two answers. One, that's not the statute that we're talking about. And second, there is a piece of content – discriminatory content-based law that allows you to look at the underlying basis for why the law is passed. And since there's basically no record to talk about this law that we are kind of talking about hypothetically, it's hard to say exactly if it would have any problems or not. But you're right that it would resolve many – Well, it just seems like Arizona is just going to be damned if they do and damned if they don't. It doesn't matter now. Well, what they can't do is burden more speech than they have to to accomplish the goals that they're trying to reach. And here – Well, their argument, counsel, is – and maybe it would be helpful if you focus in on that – is the record shows that the existing laws aren't adequate. Now, if that's the case, then what's – what are they supposed to do to address a problem of traffic flow that is identifiable? It's just like either hailing a cab. I mean, that obviously is legal, but you can identify the transaction because cabs are painted yellow. They're licensed and everything else, or whatever they're painted. There are circumstances that they say are attendant to this kind of day labor solicitation. The people group together. They create congestion on the sidewalk and they create difficulties for the businesses. And they say that the existing laws are inadequate to do that. So there are two parts to my question. Is that the record? And secondly, how do we assess the record in light of counsel's representation that neither the driver nor the day laborer can be charged under this unless the day laborer gets into the vehicle, which means that they've really targeted a very narrow circumstance? The two parts. Was there enough evidence to show that existing legislation isn't working? And what's the effect of limiting it to getting in the car? Well, with regard to the record, we actually have a finding on that record. And the district court made a finding that they had not established. That they had not established that. And that, as a finding of fact. Had not established what? That they had a, that the laws in place were not effective to address the problem. And so what the record shows and what the district court was looking at was a handful of articles over the last nine years, many of which not even discussing traffic at all. And then a couple declarations discussing a couple intersections in Phoenix. And as this court said in Redondo Beach, burning speech is the last resort. It's not the first thing you go to. And in order to do that, you've got to show that the problem you're addressing, that the scope of your fix is as broad as the scope of your problem geographically. What are the specific findings that the, I was asking counsel for the appellant whether the district court made a finding that the statute was intended to address illegal alien, immigration rather, illegal immigration. Was there that finding in the record? I agree that that's a finding. And I'd also like to point out that understanding. Well, what findings did the district court make that support your position that the present, that the present laws were not, the present traffic laws were not adequate. And also that this statute was to address illegal immigration, not traffic. I think those are the findings of fact, Your Honor. There's additional findings, but I think those would be more, more characterized as mixed issues of fact than law. Counsel, can you help me with the language of the district court's opinion? I'm looking at 846 FEDSUP second at 1058 where Judge Bolton writes, the court finds that Arizona has asserted several substantial governmental interests that animate the two sections, including the one on which defendants principally rely, traffic safety. Isn't that a factual finding that the state has established that traffic safety is the problem that the statute is trying to address? Well, what the court said and what we've agreed is that general traffic safety is an appropriate substantial government interest. But the question is whether this, these statutes are actually tailored to address that interest. And that's where, and that's where Arizona can't make its, can't make its choice because of the various tailoring problems that they have. So you're not disputing that traffic congestion is a legitimate problem. What you're disputing is the means that the legislature has chosen to address that problem in this statute. That's right. We're not, we're not saying that traffic safety is not a legitimate governmental interest. You're right, Your Honor. She says on page ER10, is this what you're saying is the finding here, numerous other traffic regulations are already in place in Arizona to directly address traffic and safety without restricting speech. And then she goes on to civil penalties for stopping or parking a car, unlawful to open a door on a motor vehicle if it interferes with traffic, maximum sentence of 30 days in jail imposed if a person recklessly interferes with the passage of any highway and so on. Are those the findings we're supposed to accept? Yes, Your Honor. In addition, I spoke about the criminal penalty, and I just want to talk about how outsized and how out of step that is with the other traffic statutes that are on the books in Arizona. If you impede traffic while soliciting work, even for a second, it's a potential six-month jail sentence. And when I say that, it's subject to all the other elements that you discuss with counsel on the other side. It's subject to a six-month jail sentence. But as I said, that's divorced from the actual whether you've actually impeded traffic more severely than somebody else. And in comparison, if you impede traffic in a reckless manner, which means that you're creating a larger traffic problem, under Arizona's law, you're only subject to a one-month jail sentence. And so what you've got is not only a statute that doesn't directly advance, you've got a statute that excessively punishes and excessively punishes based on speech, and that's a direct violation of the First Amendment. And it's also a content-based violation. And so let me then transfer to the under-inclusiveness problem of the statute. Now, it begins with a content-based problem, that it only focuses on a single type of speech and lets all other speech go unregulated. But it's actually more profound than that in the under-inclusiveness context, because there's a whole host of other reasons why people would impede traffic that have nothing to do with speech. You might impede traffic because you're late to a court hearing and have to hurry across the street. You might decide that you can make it while the streetlight is blinking, don't walk, don't walk. Those things don't have anything to do with speech. And yet, so basically the entire universe of things that could be affected by traffic safety, Arizona has singled out and discriminated only against work solicitation speech. And their point that this is a significant problem in Arizona is really based on this. Because they say in 2009 there were more than 100,000 crashes. They can't tie a single one to day labor or work solicitation. They talk about very high fatality rates in Arizona because of traffic. They can't tie any of that to work solicitation. They've also got problems with tailoring because the district court held that the purpose of the statute was immigration regulation and not traffic safety. And as the Court in Sorrell said, when the State is backing up from its own justification, the justification that the legislature put forward, that's a tailoring problem. Well, the purpose, the Court made a finding that the purpose was to address illegal immigration. They said that's clearly erroneous. Why is that not clearly erroneous based on the record that we have here? What was the basis of that finding? The first rule of legislative intent is the language of the statute. It's the plain language of the statute. And if you go to the very beginning of SB 1070 in Section 1, it says that the purpose of all of SB 1070, including Section 5, is to address immigration and immigration regulation. And that, I think, will be a transfer point for you. And I don't think you have to reach this point to uphold the district court ruling. But I do want to express that this is political speech that is absolutely central to the immigration debate happening in Arizona. The public policy number one, the public issue number one that Arizona is debating right now is immigration and immigration regulation. And though we agree that general work solicitation would be commercial speech, it ceases to be commercial when it becomes intertwined with a political message. And here, Arizona is basically saying that day laborers should be driven out, that they don't contribute to society, and that they should be attrition through enforcement, that they should basically be removed through the state. And by engaging in day labor, the day laborers are saying, I'm here, I'm working, I'm contributing. So you're saying we should say this is intertwined with political speech and go even higher than what Judge Bolton did? Yes, Your Honor. But isn't your position that you win no matter what standard we apply, whether it's central Hudson or Sorrell, that the state simply can't meet those tests? That's right. And as this Court did in Redondo Beach, it began with the lower level of scrutiny and didn't reach the question that ---- So why do we need to go as far as you're inviting us to go? You do not need to. I'm just merely ---- That's on your wish list. Yes. Yes. Okay. And just I didn't quite answer my question, I don't think, on the narrowing the statute to just getting in the car. That just goes to the tailoring problems, that they're not at all actually addressing the impeding of traffic problems that they say they're doing. And that's because they're trying to address traffic by regulating speech. It's not a direct way of doing that. And just in closing, I want to mention a couple other things. One, counsel repeatedly said that this was about in-street solicitation. It's not. You could solicit anywhere as long as you get in the car at some point while it impedes traffic even for a second. And so that could be even on the sidewalk or anywhere else. And the last point, and this is one that the district court also made, is that this provision is in Arizona's criminal code rather than its traffic safety code. And that's just another factor pointing that this is not a traffic provision. It's really to punish speech. Okay. Thank you. Mr. McLaughlin. He's right about the studies, isn't he, that none of the studies that are in the record drew a link or showed any causal connection between pedestrian deaths and day labor solicitation. You don't have any evidence that actually makes that connection, right? There's no particular study to that effect, but the legislative record does show a link. And it does include exhaustive discussions about the traffic safety issues based upon observations of people. No, but the reports. You referred, I think, to a study about pedestrian fatalities or pedestrian, I think, in your briefs. Didn't you refer to those? Absolutely. I mean, they don't tie it to day labor, do they? No, but we believe that provides context to the legislature here having concerns about traffic safety issues in general. Well, that may be, but they've targeted one kind of activity as a result. One particular form of conduct arising out of certain negotiations, yes. Negotiate is another word for speech. The underlying communications are speech, but it's the conduct that's being regulated here, Your Honor. And I kept hearing or I heard several times that this is, that they're taking issue about this being about in-street solicitation. It has to necessarily be about in-street solicitation, because otherwise it wouldn't result in a disruption of traffic. And this one-second issue that kept coming up I don't believe would trigger the statute. If it was one second, I don't imagine that would result in a disruption of traffic that would trigger the statute. There was discussion about the potential. But, see, counsel, I still have a lot of problem getting over this notion that you can sit there for an extended period of time under this statute. Well, unless we, if we excise the attempt clause. And you're saying we're going to get this so narrow that you can tie up traffic, but if you discuss employment and then get in the car, now we've got you under a criminal statute. Well, it goes to the you're danged if you do and you're danged if you don't. The legislature was attempting to tailor this to the specific issue that was causing the problems. And could it have perhaps covered more? Yes, but that's not the statute. Well, but they didn't. The way the statute is presented to us includes attempt. So you're asking us to narrow down what the legislature did. And it puts us in the awkward position of legislating from the bench, doesn't it? Well, I believe the attempt to hire is a qualifier to the and pick up that follows. You attempt to hire or hire and ultimately pick up. But regardless, even if it is attempt to hire, if it results in a disruption of traffic and it's so construed, that's the same issue or problem that the legislature is attempting to cover here. And the unrefuted evidence in this record here is that the existing traffic laws, whatever they may be, were both insufficient to cover all scenarios that the legislature was concerned about and certainly not providing adequate deterrent. But what's the evidence that refutes the finding that I read from ER-10, that the numerous other traffic regulations directly address traffic and safety without restricting speech? That doesn't have anything to do with whether they're sufficient. And the unrefuted evidence was that they were not sufficient. And the unrefuted was the statements of the two police officers? One veteran police officer, Your Honor, who walked through each and every one of these statutes is someone in the field and explained why they either do not apply in every one of these statutes, or they do not apply in every one of these statutes.   They're not providing adequate experience. And there was some issue about the potential penalties that arise out of these statutes. And some deference has to be given to the legislature in how it responds to the issue. And here the legislature saw this as a significant problem. So they did. They did up the ante because, exactly because the existing laws, to the extent they did apply, weren't doing the job. The underinclusive issue goes to this content – well, first, the content-based issue came up several times. First, under Central Hudson, whether the statute is content-based or content-neutral is immaterial. That's been affirmed as recently in the Metro Lights case and the Coyote Publishing case out of the Ninth Circuit. Secondly, this underinclusivity issue, simply the two last steps are, does it reasonably advance the governmental interest here? Here it does. These statutes only apply when there's a traffic safety issue, actual traffic safety issue. That directly advances Arizona's traffic safety concern. Secondly, with respect to whether they cover more, Central Hudson, Fox, and all the other commercial speech cases that follow, don't require the least restrictive means possible. There just has to be a reasonable fit that has to be carefully calculated. And, Your Honors, we submit that, in this instance, the Arizona legislature did narrowly tailor these statutes to address a significant public safety concern that's been arising out of or has been discussed since Cox. Okay. Thank you very much. Thank you. Counsel, thank you for the argument. It's a very interesting case. And we will submit it and get back to you in due course. And we are on recess or adjournment. I think we're at recess.
judges: Fisher, Tallman, Callahan